# Wytheville

VIRGINIAN RAILWAY COMPANY V. B. M. GREEN.

June 15, 1933.

Present, All the Justices.

The opinion states the case.

*Thomas W. Ozlin* and *Hall, Buford & Leftwich,* for the plaintiff in error.

*R. S. Weaver, Jr.,* and *James S. Easley,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

This writ of error brings under review the incidents of the trial of a crossing accident which resulted in injury to the plaintiff, for which he recovered a verdict and judgment for $7,500. The chief assignment of error upon which the railway company rests its contention for reversal is the action of the court in refusing to set aside the verdict. This compels an analysis of the evidence.

On February 14, 1931, plaintiff, driving a 1929 model Ford truck, traveling west, was struck by a large Mallet engine pulling 137 loaded coal cars going east, at a highway grade crossing approximately one mile west of the town of Victoria. Some 2,900 feet west of this public crossing a private road crosses defendant's right of way, referred to in the evidence as the Daniel Jones or Fowlkes crossing. The burden was upon plaintiff to show that the defendant company was negligent in failing to give the crossing signals required by statute. For this purpose he relies upon his own testimony and that of six other witnesses.

The testimony of three of these witnesses is entirely negative and has little, if any, probative value. The testimony

of Mr. and Mrs. W. A. Stewart and their son, Eugene Stewart, who at the time of the accident lived just west of the highway crossing and within a few hundred yards of the whistle post on the right of way, is positive that the crossing signals were not given. All three testified that they heard the signals given for the Daniel Jones private crossing, that they saw the train as it passed the whistle post, and that no signals were sounded between that and the highway crossing. Eugene Stewart testified that he was within fifty yards of the track when the engine passed and he intended to board the train for the purpose of riding into Victoria; that he heard the crash and went with the parties who took the plaintiff from the scene of the accident to the hospital in Victoria; that on arriving in Victoria he was asked by several parties how the accident occurred and if the whistle was blown, to which he replied, "Hell, yes, it blowed and blowed a plenty."

It seems that W. A. Stewart was a former employee of the defendant company and several years prior to the accident had gone out on strike and had never been reemployed, and on account of this had more or less animosity against defendant.

It was established that the engineer on the train was H. L. Wright, who on approaching Victoria, where he and other members of the train crew lived, was in the habit of blowing his whistle in a peculiar manner, known as the "whippoor-will." Some twenty-five witnesses, besides the members of the crew, gave positive testimony that the crossing signals were given; three lived within two hundred yards of the whistle post, saw the train and heard the signals sounded; four lived close to the Daniel Jones crossing, saw the train and heard the signals after the train had passed that point and before it reached the highway crossing; three were within a quarter of a mile east of the point of impact and heard the crossing signals before the engine reached the highway; one colored man, a former employee of defendant, was riding on the fourth car from the engine and saw

the truck approaching the crossing and heard the signals. Mrs. C. R. Bowden, wife of the brakeman who testified that he was ringing the bell, knew that her husband was on the same crew with Engineer Wright and as soon as she heard the "whip-poor-will" blow for the crossing began to prepare his supper. L. C. Croft was a motor mechanic working at a garage situated in the western part of the town of Victoria with whom Wright had left his automobile, with instructions to have it ready for him on his return from this run. Croft stated that he was expecting Wright to return on this train and was therefore listening for his blow, that he heard the signals and knew that Wright was approaching the crossing. Some eleven other witnesses, employees of defendant company, living in Victoria, knew Wright and his peculiar blow and testified that they heard the whistle blow the crossing signals.

This summary shows that of the thirty-five witnesses who testified on this point all except three knew that this train was approaching the crossing. D. E. Gaulding and W. M. Hawkins were leaving Victoria in a wagon when plaintiff passed them in his truck; they were not in sight of the crossing or the train and the noise of the wagon probably prevented their hearing the sound of its whistle and rumble. The other witness who testified that he did not see or hear the train was plaintiff himself.

On this conflict of evidence the jury has found in favor of plaintiff, which finding the trial court has approved. If this court were the jury, probably it would have reached a different conclusion; but under the rule which is firmly imbedded in the law of this Commonwealth, the court is bound by the finding of a jury on a conflict in evidence.

If we assume that the statutory signals were not given, there is no reliable evidence tending to show that the failure to give them was a proximate or contributing cause of the injury.

Leaving Victoria, the highway runs parallel with right of

way of defendant company until it reaches a point approximately three hundred feet from the crossing, when it turns south and crosses the right of way at about right angles. The view of a traveler on the highway as he makes the turn and approaches the crossing is obstructed by woods until a point sixty feet from the rails is reached.

Plaintiff testified that his truck was equipped with four wheel brakes, recently relined and in good condition; that the windows to the cab were down; that he was on the careful lookout for approaching trains; and that he was familiar with this crossing, having gone over it more than a thousand times; that when he reached a point some twenty or twenty-five steps from the rails he reduced his speed to about five miles an hour, looked to the west and saw no train, that it "must have been behind those bushes because it was not close enough to the crossing for me to see it at that time;" he then looked to the east, where his line of vision was partly obstructed by two small piles of ties on the right of way. When within a few feet of the rails he again looked and saw the engine almost on him. He realized that he could neither get across in safety nor stop his truck before reaching the rails, so he applied his brakes and cut his truck to his left, or eastward, and was struck by the engine and sustained the injuries alleged.

Plaintiff was positive that the speed at which he was traveling at the time did not exceed five miles an hour. He was unwilling to state in just how many feet he could have stopped his truck, or just how close he was to the rails when he saw the train. The physical facts show that from a point sixty feet north of the rails plaintiff had for some two thousand feet an unobstructed view of trains approaching from the west.

The credible testimony fixes the speed of the train at eighteen to twenty miles an hour, which was from three to four times faster than plaintiff testified he was driving, so that when he was sixty feet from the rails the train was between 180 and 240 feet away and clearly visible. The

highway is described as a broad, smooth surface, covered with gravel, and for fifty feet from the rails the grade is five per cent.

Witnesses for both parties testified that there were marks showing that the truck had skidded some distance before reaching the rails. Four witnesses for defendant testified that they saw the skid marks within an hour after the accident and they began at a point twenty-five to thirty feet from the north rail; witnesses for plaintiff testified that they saw the skid marks the morning after the accident and they began at a point fifteen to twenty feet from the north rail and extended from five to eight feet towards the rails and then turned east.

These physical facts do not harmonize with testimony of plaintiff because (1) when plaintiff came out of the west end of the curve the front of the engine was not more than 250 feet from the crossing and if he had looked carefully, as he said he did, he should have seen it. (2) If plaintiff was traveling at ten miles an hour and the train at twenty miles an hour, when he was sixty feet from the crossing the train was 120 feet; if he was traveling at six miles an hour and the train at eighteen miles an hour, when he was sixty feet from the crossing the engine was 180 feet from it. If we accept the interpretation of plaintiff's testimony by his counsel, *i. e.*, that he looked to the west before coming out of the curve in the highway and his view of the approaching train was obstructed by the woods, the fact that the skid marks of his truck extended from six to eight feet up grade before turning to the left shows that he was traveling at a greater rate of speed than that stated by him. It is a matter of common knowledge that an automobile truck of this type, equipped with four wheel brakes in good working order, going up grade on a dry, gravel surface road, driven at ten miles an hour, or less, will stop before skidding six to eight feet.

With these facts in mind, we are unable to say whether or not the failure, if there was a failure, to sound

the crossing signals was a proximate or contributing cause of the collision.  In other words, there is no reliable evidence to establish facts and circumstances from which the jury might have fairly inferred that according to the ordinary experience of mankind the accident would not have happened had the signals been given.

For the reasons stated, the judgment of the trial court is reversed, the verdict of the jury set aside, and final judgment here entered for the defendant.

*Reversed.*